We'll start with 23-4110, Gaddy v. Corp. of the President of the Church of Jesus Christ. May it please the Board, my name is Kay Birmingham and I represent the plaintiffs in the underlying action. Laura Gaddy, Lyle Smith, and Leanne Harris. The case is a putative class action case. We have not yet moved for certification because we wanted to get the constitutional issues voted on first. It's against Apoie Corporation. We have appealed dismissal of the RICO claim that has been alleged in two separate types of areas. Number one is a misrepresentation of facts concerning LDS history. I don't have the time and I will only talk about the brownstone in the hat issue for purposes of today's oral argument because there are too many to reference. The second one is with regard to misrepresentations on how tithing was used once tithing was collected. Are we good to go? All right. It was interesting. I noticed on the exterior of the courthouse there's a Latin phrase and I won't attempt to pronounce that in Latin, but it states in English that to no one shall we deny justice nor shall we discriminate in the application thereof. And I would just ask the Board if they could keep that in mind because we are just a group of individuals and we are former members of LDS Church who are suing the Church, not all of the members of the Church, and that's a much smaller group. That was incorrectly stated, I believe, in the appellee's briefs, but it's just the former members. We realize that there may be many members who don't think that the issues we address are significant, but to the ones that we are representing, those were very key issues. And our argument is, number one, that Church tithing doctrine does not apply because if you go back and read the Watson case, that was the origin of Church tithing or ecclesiastical difference. Two things had to be shown before the threshold of application of Church economy was met. Number one, that the Church and its members can believe anything they want and they can practice any kind of religion or preach or do any act that they like as long as it wasn't against public morals. Number two is that the reason for that is that there's an assumption that people who join the Church do so with their implied consent and they know what they're doing. Why does it matter whether the Church leadership believes the Church doctrine? Because the Brethren have said many, many times in general conference, which is twice yearly attended by the plaintiffs in this case, every year, twice a year, that we will not lead you astray. And their doctrine is correlated and only certain things are taught at the local level or at the high level. And they have admonished the members not to read the internet, not to check outside sources. In 2010, a Deseret News article came out and said, don't use proper sources. Well, let me ask it a different way then because we're not really getting to what I'm asking. If the Church leaders do believe it, do you lose your lawsuit? Do you what? Do you lose your lawsuit? Yes. I would have thought that even if the leaders of the Church believed it, there could still be a possibility for fraud from omissions, which is to say, even if the Church is true, there's still room for a civil recall. But your first answer says no. Let me qualify that, Your Honor, if I may. There was an argument that we made a circular argument that the Church leaders are not sincere, therefore what they taught they don't believe, and therefore the case is worth nothing. But because the Church leaders have concealed all these artifacts, stones, documents, primary sources for over a hundred years, that argument doesn't fly. And so the Church, even though certain people don't believe it, they're charged with knowing about the contents of their archives. And just as President Nelson a couple of years ago revealed in the reenactment of the video, this is how Joseph Smith created the Book of Mormon, dictated the Book of Mormon, was he placed a brown stone or a stone in a hat, put his head in the hat, and the gold plates were covered usually. And so that's an admission as far as we believe, that what they had taught for decades was not true and that they didn't believe it because they had the stone in their well since 1907. Well, when you say not true, then we are heading into deep religious waters there. Well, but their state of mind was not true. They did not believe what they represented. Why does it matter if they believed it? In other words, here's my point. Even if everything about the Church is true, the plaintiffs still may not have joined the Church, may not have contributed their time and money, if they would have known about the seer stone, or if they would have known about the translation of the Book of Abraham or other items, even if it's true. But you're kind of fighting me on that. I'm not sure. I guess I don't understand your question. Okay, well, I'll let you continue. I'm just saying that misrepresenting one's state of mind is a misrepresentation of fact. If we say that these are the correlated true facts about the Church and the history, and they're not, that's fraud. Well, let me ask you from the opposite side. I suspect that most religious leaders have doubts on occasion. So if that's the case, then you can always avoid the religious doctrine. The legal doctrine involving religious matters, by saying, well, at this time, that church leader didn't actually believe it. Right. Even though they may have overcome their disbelief, for a variety of reasons. But does it mean that if religious leaders ever have doubts about their faith, then the doctrine that protects them from court examination of doctrine is eviscerated? No, but I think facts are different than beliefs. And I think certainly part of the faith process is deciding, do I really believe that Jesus was resurrected or not? And you have to come to some sort of, you know, maybe I do, maybe I don't. Do I believe in God? I'm not sure. I'm an agnostic. But when we have facts and we have evidence of a fact that happened, which is different than which is empirically provable, my argument is that, and maybe I'm extending this a little bit, or I'm resurrecting the underlying implication in Ballard, is that you need to sincerely believe those facts to take them out of the fraud elements. Fraud is a misrepresentation of fact. And that's what we have here. And all these artifacts in the stone, just let's go to the they knew or were charged with the knowledge that the stone was there, and yet they commission artists. The only artwork that they ever displayed was Joseph Smith translating from open gold plates with no seer stone in sight. So this is a fact issue, and there has to be, I would think there has to be a line drawn between the fact and belief. Well, nobody has repudiated the golden plates, have they? Nobody knows what haven't known, but this is not about the golden plates. Well, but you're saying, I just want to make sure, you're not saying, in fact, it was a seer stone and that gold plate stuff never happened, and that's not a religious belief? No, we're not saying that. We're saying that exactly what the Prophet admitted, and he said, we know, not just this is my opinion, my belief, but in his reenactment is, we know that Joseph Smith put the stone in the hat and the plates were covered as usual. And so that process is radically different. When you join the church, you're taught that, and when my clients join the church, you're taught that there were these gold plates, and they were inscribed by ancient Hebrew prophets to give wisdom to the latter days, and now with this different process that President Nelson has admitted, that really casts a lot of doubt, and it's an admission, and they've done that with the other things, the book of Abraham, and Joseph Smith having many, many wives as well, and so this is different than any church, because number one, there may be churches that negligently didn't disclose things about their religion or have different beliefs. That's fine. We're not saying that Rico would cover that type of thing, but we believe, and we've alleged, that they intentionally made this correlation committee in order to conceal all this evidence against what really happened, because the narrative... Let me, I think we get your point. You've read the briefs too. Okay. Let me ask you specifically about your claim regarding the use of type. Okay, sure. Now, I think the complaint acknowledges that to belong to the church, you had to type. To get the full benefits of the church, you could belong to the church, but you wouldn't be able to, for instance, go into the temple and be married for time and eternity without swearing that you're a full-type payer, so to get the full benefits, you had to be a full-type payer. My impression was that, Ben, that the plaintiffs who claimed they wouldn't have tithed if they knew that the money for the real estate development was coming from the sources it was coming from, they would not have tithed. Would they have left the church? Yeah, many, many would. Many would. There's no allegation in the complaint. Well, I think there's an... I'm sorry. I think there's an allegation that says they would not have tithed, or they would have reduced the amount of tithing they paid, and that the combination of both using tithing, and this is principal because, as per David Wilson's affidavit from 1997, they used about $1 to $2 billion of a $6 to $8 billion annual tithing income and just dumped it into EPA and to Enzyme Peak Advisors. So we have people who... a few people who said, well, I don't know. If I really believed the core tenets of the church, then the tithing thing wouldn't have bothered me so much. And we have other people, and my claim is to say, no, both of these things really would be reason to pause. And especially if we knew about the tithing, we might have researched more and gone and not trusted our leaders, gone beyond... That's not an injury. The injury you're alleging is an economic injury. Yes, that's right. That you paid the tithing. That's right. Just saying that we might have researched more and left the church altogether, if we would have known that they weren't straight with us about the tithing. And the tithing is mostly material emissions. And I do believe that. Because as... But the plaintiffs say they would have taken the risk to their souls, essentially, by not tithing if they had been told. They would... Go ahead. Yes, and they would have... And I can find that during Al-Khalili's argument, if you want me to. But they wouldn't have joined the church or tithe if they knew what they knew. And what was revealed in 2019. Judge Shelby ruled that the allegations on the tithing were not particular enough for Rule 9 and fraud. And you contrast the allegations in this case with, say, James Huntsman, who's very precise on how much he paid for tithing, as well as relying on the five statements that are identified. Your plaintiffs are not as precise. Is that right? I don't think that's true. Do they say how much tithing? No, we don't say that because we don't have to say the amount of damages, although I can tell you right now. But we have specifics starting in 1963, when the church begins fostering belief that tithing proceeds are separate from the money-making or the profit-bearing subsidiaries of the church. We have 1997, when EPA was created. We have back in 2003, when the classic no tithing was used for City Creek, and that was not explained. Then that was repeated in Deseret News and Ensign magazines and online. And Laura Gaddy, we have a specific allegation that her husband, she had a friend say, oh, did you know they're using tithing to build the mall? And she had her husband look it up, and in these two publications, it said, no, no tithing was used in City Creek in 2003 and 2007. Also, they didn't indicate that Beneficial Life was bailed out by the use of tithing. Isn't all the church's money tithing? Yes, and they admit that as much, that it's all one. They put it all in one big hedge fund to use. Well, then why are you the plaintiff surprised that the money came from tithing, if that's the only source? Because that's not the only source. The LDS Church has many subsidiaries that are profit-making subsidiaries. Investing tithing. Well, you know, Deseret News from selling books, Bonneville International Corporation from broadcasting, not just conference, not just LDS things, but other companies and other things. And they've always been told that this is a profit-making, these are profit-making subsidiaries. This is not the spiritual aspect or the tithing that's being used. And so I just don't think that, I mean, I think, and then in 2018, there are some graphics in the Ensign just before they resigned that say this is what we use tithing for. And nowhere does it disclose that we invest principal into commercial activities. So I see that. Your time has expired. Yes, thank you. Mr. Jordan. Good morning, your owners. May it please the court, I'm David Jordan, here on behalf of the Church of Jesus Christ of Latter-day Saints. The appellants are asking this court to reverse and remand to the district court for a jury trial on whether Joseph Smith, the church's founding prophet, saw one member of the Godhead or two in a vision in 1820, and whether God inspired him to translate the Book of Mormon from place engraved by ancient prophets using a stone known as the Urim and Thummim, or instead using an opaque seer stone. Let me have you pause there, because that's what I need help with. How does our case and the allegations in our case involve resolving internal church disputes requiring adjudication of questions of religious doctrine? In other words, you say that plaintiffs are asking us to say which version of the vision is the true one, but in fact what they're saying is there were two versions. We don't care which one is true. If we would have known that there were two, we would have headed for the exit. So I don't see how we're resolving any religious doctrine. We don't care which one it is. It does involve the resolution of church doctrine because in effect what they're asking for is a heresy trial. It's a determination of what is the orthodox belief, as if there were some monolithic understanding of every detail of church history by every leader of the church or every church member from 1820 to today. And as the court said in Watson v. Jones, the law knows no orthodoxy. Well, whichever is true, we're not concerned about. The plaintiffs aren't bringing that to us. But what they are bringing to us is that a seer stone was used, which if that were disputed, I would understand, okay, now we're getting into religious waters. But it sounds as though the church agrees that a seer stone was used and that was something that was not revealed for decades. And the plaintiffs say, if only someone would have told us that it was a seer stone instead of gold plates, at least for some of it, we would have walked. And I don't know why the seer stone would have been concealed except for that. So that's what I need help with. Isn't that a bizarre thing to say? They say specifically, we don't dispute that the Book of Mormon is true. We don't dispute that it was translated by the gift and power of God. We dispute whether it was translated using the Urim and Thummim, a clear stone, or an opaque stone. That almost sounds silly. Churches have the right to define, develop, and evolve their own history. The inconsistency that she's pointing out, I would like to make clear. Alleged in the complaint is the use of a seer stone versus a piece of art, a painting painted by some early member of the church depicting Joseph Smith sitting at a table looking at gold plates. Well, who's to say he didn't? Who knows what happened in 1820 or whether he sat at a table and looked at gold plates. We're asking, she's asking the court to, to intrude on the miraculous, on matters of faith. Church history is full of references to the seer stone. Church history is full of references to the Urim and Thummim. It's full of references to the Joseph Smith studying the gold plates. And how, 200 years later, we're supposed to decide exactly by what process God inspired? Nobody's asking that. I think that that, that is not their argument. That they're asking the court to say, was it the seer stone or was it the gold plates? Which clearly we can't do. Their argument is, you all have your beliefs and keep them and we respect that, but don't join us in without telling us key information like there was a seer stone. We don't, I don't think they're here to prove the untruth of the truth of Del Dios Church. They're saying, if we had only known these facts, which weren't revealed, we wouldn't have participated and you all do as you please. What I would say to that, Your Honor, is this. What they're asking the court to prescribe is the manner in which the church teaches its doctrine. What things you should emphasize? What things you should particularly point out to members of the church or to prospective members of the church when you're teaching the gospel of Jesus Christ to them and the history of the church? And to say, well, what you need to do as a church, what courts are telling you you must do as a church is put particular emphasis on the method by which the Book of Mormon was translated and any disputes about that or anything that hasn't been given emphasis in the past. That is an intrusion on a deeply rooted religious matter. Is there any limit to that principle? Which is to say, can a church conceal anything, even if it thinks, wow, we're going to lose half our membership on this. We better put it in a vault somewhere. Is there any limit on what a church can conceal and not be subject to civil recall? I think there is no limit at all on what a church is required to teach or not teach. Emphasize or not emphasize. I think that would be a deep intrusion into what you described as deep religious waters. Let me switch to the other part of their claim. Do you agree that religious doctrine, that's what I'll call it, does not apply to their claim that the church misled them about how tithing funds would be used because they were told... I'll sit forward. You've turned up the mic as far as you can. Sorry about that. Do you agree that the plaintiffs can bring a RICO claim based on misstatements regarding how tithing funds would be used, in particular, whether the funds would go directly to the real estate development by the temple? I do not agree. First of all, I think Judge Shelby is right about his application of 9B to their RICO claims. Let me ask you about that. He said the allegations of reliance were not... There's nothing in 9B about reliance. 9B does not cover reliance. It says you have to state with particularity the circumstances constituting fraud or mistake. Of course, reliance is an element of fraud. That's not what 9B covers. You might have an argument under Iqbal Twombly, but you don't have an argument under 9B. All right. I certainly won't dispute that with Your Honor, but let me go to the heart of your question. The statement that they reference is one made in a sermon by the then-church prophet Gordon B. Hinckley in 2003, in which he said that tithing funds would not be used for the development of City Creek. And then he said, instead of tithing funds, we will use revenues from commercial enterprises owned by the church and earnings on invested reserve funds. That's not their... I think you have a pretty good argument with respect to that statement, but they also reference other statements endorsed by the church in their publications, which said that principle is not used, etc. And in fact, it was used. No, that's their allegation. In fact, they do not allege that principle was used and not earnings or interest, nor could they. That's the dispute in the Huntsman matter. And it boils down to this. It ultimately comes to a definition of tithing, which is also a deeply rooted religious matter. We explain it in this way. Tithing as the church defines it, and the church has the right to define it under the autonomy doctrine. Tithing means the donation. It's the sacrificial freewill offering of a member. It's not earnings on bond coupons. It's not stock dividends. Earnings is what... A tithing is what you give. And so when President Hinckley distinguishes between tithing and earnings on invested funds, he's making a distinction, if you will, between principle and interest. And they cannot allege, and they do not allege, unlike James Huntsman, that tithing in the sense of their donations were used to build Citigroup. And I will point out... Well, isn't there an affidavit to the contrary in the record? No. Explain why that affidavit doesn't contradict what you're saying. Okay. That's an affidavit at page 106 of volume four of the record. And what it says is that this man attended a meeting. He's also a disaffected former member in which an executive of Ensign Peak, a funds management company employed by the church, said, we think of everything as tithing. We think of everything as the widow's mite. Well, that's simply an expression of a view of an executive, not a church ecclesiastical leader, that everything, whether it's the original tithing donation or whether it's earnings on it... He goes further than that. He alleges that the use of principle was hidden by having the money go to this other entity, which then put it into the real estate development. But you don't... I don't see it that way at all. Well, you may not see it that way, but couldn't one draw a reasonable inference to that effect? And you could dispute this at trial or maybe with further affidavits on summary judgment. But at this stage of the proceeding, hasn't the complaint alleged enough with this attached affidavit to suggest there's evidence that money from tithing was essentially, maybe through a couple channels, but was directly used for commercial development. And contrary to what church official court statements had said. I think that's... I don't think that's consistent with the record. Tithing is the donation. Tithing is not earnings on the donation. That's what President Hinckley said was used. And there is no allegation in this record. There is no allegation in this second amended complaint about tithing itself having been used as opposed to earnings on tithing. Well, I can look at it again. I thought that is alleged in that affidavit. And I didn't feel that your brief responded to that fully. So that's why I wanted to pursue that here. What they try to do is what Mr. Huntsman tries to do and conflate the two and say, well, it's all tithing. But it's not all tithing. As President Hinckley's statement makes clear. And I'm now intruding on Mr. Sherr's time. We'll give him his three minutes. Any other questions for me, Your Honor? Thank you, Counsel. Thank you. Good morning, Your Honor. All three of your honors. I'm Gene Sherr and I'm delighted to be here representing the National Association of Evangelicals, which is the largest umbrella network of evangelical churches in the United States, as well as the General Conference of Seventh-day Adventists and the Jewish Coalition for Religious Liberty. If the opponent's allegations stated a cognizable civil recall claim, nearly every religious organization would frequently face such claims from disaffected members and the related stigma of being accused of being a criminal enterprise. For example, you could have some Catholics claiming that their church defrauded them because they made contributions based on allegedly insincere statements or insufficiently supported statements by the Pope indicating that God may be okay with same-sex relationships only to be told something different later. And under Plainness Theory, these and many other fraud claims would not only turn on theological issues but would also turn in part, under their theory, on a factual issue, that is, what does or did the Pope actually believe about a particular issue? And if Plainness Theory were correct, disaffected Catholics could routinely assert such claims and thereby subject the Catholic Church to the substantial burdens and costs of discovery and litigation, at least through summary judgment. How does your example deal with concealment? I don't follow that. Well, that particular example doesn't, but you can imagine other situations where the Pope or the Catholic Church is alleged to have suppressed evidence about a particular matter, like the Shroud of Turin or an even number of information about facts that people could claim were improperly suppressed in which, if they had known those facts, they would have acted differently. Your example is a hypothetical, the one that you're giving, the Shroud of Turin. That's not what we're talking about here with seer stones. No, that's true. It's not, there's not a one-to-one correspondence. But people accuse religious bodies all the time of hiding information of various kinds. And if that were the basis, and especially when it's information that deals with a religious issue, if that kind of a claim were allowed to proceed as a RICO claim, you would be opening the floodgates to those kinds of claims. And I think the right way to respond to those kinds of claims is the way this court did in the Bryce case, where it articulated the test of whether the matter at issue is purely secular. So even if it's just partly religious, that's enough to put it in the church autonomy doctrine category. Well, didn't Justice Jackson, I think it was a concurrence, say, I'm sorry. Didn't Justice Jackson say in a concurrence that it would be different if a religious leader said, this money is going to be used to build a church, and said it's used for personal expenses, you know, a claim or whatever of the religious leader. Did you think that's protected by the doctrine? Well, I think it would depend on exactly what the statement was. If it was in part religious, then under Bryce, it would not be actually- Well, I'll ask you about the specific here. Now, your predecessor at the podium said that this is not alleged in the complaint, and that's something to be explored further. But if church leaders had said, tithing funds will not directly be used in a commercial project, although if we have excess tithing, we can invest it, and that income can be used for commercial projects. But in this case, tithing funds were funneled directly to the commercial project. That would not be covered by this doctrine, would it? I think it is covered by the Sharia Autonomy Doctrine, yes, because concept, that tithing is an inherently religious concept. And so, under the Bryce standard, it can't be purely secular. Now, if the church had said, just hypothetically, if the church had said something like, no church funds of any kind will be used in this project, that statement by itself could be considered to be purely secular, but when the church, when the statement at issue is no tithing funds will be used, that's inherently a religious matter. People have different views. Yeah. It seems to me that there ought to be a distinction between the religious matter of you need to tithe to be admitted to the sanctuary, and your soul depends on it, or things like that, but to say what the money is going to be used for and then use it otherwise, that seems to fit within at least Justice Jackson's concurrence. Maybe we said something in Bryce that goes beyond that, but how is that dangerous to religious freedom to say to churches, you have to tell your parishioners the truth about how your money's going to be used? Well, I think this conversation illustrates the danger, Your Honor, because for people of faith, people who believe in the biblical concept of tithing, that is an inherently religious matter, and so even just to identify what constitute tithing funds versus non-tithing funds, that's a religious question, and so if you file a complaint based on a religious leader's statement about how tithing funds will be used, you are necessarily raising a religious matter. It's not purely secular as Bryce requires. So in Justice Jackson's example, if the minister had said, tithe, give 10% of your income to this church, and it'll go for a new church, and then the minister uses it to buy a personal item, then that would be protected, but if he didn't put it in terms of tithing, it, I'm sorry, then it would be protected, but if he put it in terms of tithing, it would be protected under the doctrine? Are you making that distinction? Well, I think if the, if the minister says, I want you to donate, I want you to donate a certain amount of money, and I'm gonna use it for one purpose, and then uses it for a completely different purpose, and makes the request in a way that doesn't invoke religious concepts, then that would arguably be actionable, but I think as soon as the statement that is alleged to be actionable inherently invokes religion in some way, or religious concepts, I think that fits within the Bryce distinction between, that falls outside of the Bryce requirement that the matter be purely secular, as opposed to a mixture of secular and religious. You'll get extra time. We'll take care. We try to be fair. Now, in their briefs, the plaintiff's principle response to this point seems to be that because RICO is a generally applicable law, its application to the church falls within the deferential rule adopted by the Supreme Court in Employment Division versus Smith, that is that its application is governed only by rational basis, but the Supreme Court's decision in Hosanna-Tabor squarely rejected that argument and held that under the First Amendment, whenever any law directly intrudes upon a church's decisions about how to understand and implement its own doctrine, then government action must give way, and based on that principle, the district court's decision should be affirmed. Thank you. I'm going to give you five minutes. I think that'll be enough. We'll see. OK. Thank you. First, I'll address Mr. Jordan's points, Your Honor. We did absolutely, as Your Honor pointed out, it was in the early part of the second minute complaint, allege that by referencing Exhibit 5 of Mr. David Nielsen, who was an employee, not just a disaffected member, of Ensign Peak Advisors, where he says that the president of Ensign Peak Advisors, Roger Clark, is the one that said, oh, we consider it all tithing and that we have to be careful because we don't want them to know what it's used for, meaning the commercial investments. That is a quote, and that's in his affidavit. That's actually a paraphrase, but it's in his affidavit, that they didn't want the members to know what the tithing was used for. The problem here is that when President Hinckley, in 2003 at April Conference, says that we're going to use investment income from reserves, they don't say from tithing reserves. It's very vague. It doesn't reference tithing. Two of my three clients are female, and this was said at a priesthood meeting where only men were allowed to attend, and they claim it was later published in the Ensign, but still it was very vague. The whole statement was made so that the women wouldn't have even heard the statement that we're not going to use tithing for commercial uses. That wasn't heard by the women either. That's right. No, they heard in general conference in April, I believe it was 2003, that President Hinckley said, no tithing will be used for City Creek Mall. It wasn't followed when it was made at that later event. President Hinckley's proviso that we can use investment income. Actually, it was two times in the 1990s, Your Honor, when President Hinckley used the earned interest on invested reserves. That was in two times in the 1990s at priesthood meetings where women weren't allowed, and then it was about 10 years later in 2003 or 4 where he said at general conference where my clients attended and heard or read it that no tithing was used for City Creek. Did not define what investment on reserve income. Did he use that term, income on invested reserves? I think he did, but he didn't define it. Again, we go back to, my clients had the idea because it was fostered by the locals, the local ward leaders that the church, because it has these profit-making subsidiaries, that it was from the profit-making side of the church. There's the profit-making side that's under the corporation of the bishop, right? And then there's the spiritual side under the corporation of the president. And so these are pretty much separate entities. And we come to find out in 2019 that all the funds are co-mingled. And we did allege that, contrary to what Mr. Jordan said. The crux of the matter is that we understand that Ballard prohibits the interpretation of doctrine. We cannot overstep into the inner workings of the church to interpret doctrine. We're not saying that God inspired Joseph Smith. We're just saying we can't litigate that in accordance with Ballard. But we are saying, we are challenging the application of doctrine. They have not identified exactly what religious freedom they're trying to protect. And it sounds to me like they're trying to protect fraudulent activities by concealing things that are very important, material facts, material artifacts from members. And the First Amendment doesn't protect that under either religious clause in our opinion. And that's our argument. The other thing, as to Mr. Scherr, is that none of these other churches that he's talking about, he made a reference to the Shroud of Turin. Well, maybe they do have it and it wasn't disclosed. We don't know. But they haven't admitted as much. There's no admission. And there's no indication that there was a committee formed to propagate what's basically untruths. Just as Boyd K. Packer said, we have to tell the truth, but we don't have to tell the whole truth. And that was back in the 80s. And he was an apostle for the church. And that's in our Second Amendment complaint. And that's their whole, sort of, they go along with that. They believe that. And even Mr. Jordan said that. He believes that religion should be able to conceal anything. Intentionally conceal anything. And I don't think that's the First Amendment law. And I think that is where reliance comes into play. Material omissions are a substitute for reliance here. Because the material omission, in cases of material omissions, reliance is inferred. And that's what would be done in the ridicule case. And I think I'm over my time. Well, I also think you've discussed all the issues. OK. Thank you very much. Thank you. Thank you, counsel. Case is submitted. Counsel are excused.